# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **MILISA C. YORK AND** | **CIVIL ACTION** |
| **BARRY BERNARD LEBLANC** | |
| **VERSUS** | |
| **CITY OF ST. GABRIEL** | **NO.: 14-00423-BAJ-RLB** |

## RULING, ORDER, AND JUDGMENT

### I.  INTRODUCTION

On August 9, 2014, this matter came before the Court pursuant to Section 2 of the Voting Rights Act of 1965 ("VRA") and the VRA amendments of 1982, 52 U.S.C. § 10301 (previously codified at 42 U.S.C. § 1973), and the Fourteenth and Fifteenth Amendments to the U.S. Constitution. Plaintiffs Milisa C. York and Barry Bernard LeBlanc are white citizens of the United States and residents of the State of Louisiana. They are residents of the City of St. Gabriel and are registered to vote there.

Defendant, the City of St. Gabriel ("St. Gabriel"), is a municipal corporation initially formed as a Town in 1994 under the laws of the State of Louisiana, particularly the Lawrason Act, La. R.S. § 33:321, *et seq.* (*See* Ex. D-3, Bates No. 5). In 2001, St. Gabriel's population exceeded 5,000 residents, so it was re-classified as a City. (*See* Ex. D-6, Bates Nos. 20–21). The City of St. Gabriel elects five council members for its City Council. *See* La. R.S. § 33:382A.

The gist of Plaintiffs' claim is that the at-large election system for election to the City Council effectively affords the white minority voters of St. Gabriel less opportunity to elect candidates of their choice to City Council. Plaintiffs pray for injunctive relief, in the form of a court order requiring St. Gabriel to adopt one of two exemplar plans providing for a majority white district: one of which is a five-district plan, the other of which is a four-district plan that retains one seat elected at large.

A trial was held in this matter on January 6 and January 12 of 2015. Having considered the parties' pre-trial and post-trial submissions, as well as the arguments presented and evidence introduced at trial, the Court concludes that Plaintiffs have not satisfied their burden of proving that the current at-large system of election to St. Gabriel's City Council violates VRA Section 2, the Fourteenth Amendment, or the Fifteenth Amendment. For reasons explained more fully herein, **JUDGMENT** is rendered **IN FAVOR OF** Defendant, St. Gabriel. Plaintiffs' request for relief and request for attorney's fees and costs are **DENIED**.

## II.   JURISDICTION

The Court's jurisdiction over this matter is proper pursuant to 52 U.S.C. § 10308(f) (formerly 42 U.S.C. § 1973j(f)) and 28 U.S.C. §§ 1331, 1343, and 1344.

### III. APPLICABLE LAW

#### A. VRA Section 2

##### i. VRA Enactment and Amendment

When Congress passed the VRA in 1965, President Lyndon B. Johnson hailed it as "triumph for freedom as huge as any ever won on any battlefield." Lyndon B. Johnson, Remarks in the Capitol Rotunda at the Signing of the Voting Rights Act (August 6, 1965).

The VRA was enacted to address deeply entrenched racial discrimination in voting, "an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *Shelby Cnty., Ala. v. Holder*, ___ U.S. ___, 133 S. Ct. 2612 (2013) (*South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966)). Congress had determined that attempts to vindicate then-existing federal anti-discrimination laws through case-by-case litigation were insufficient to overcome the resistance by state officials to the enforcement of the Fourteenth and Fifteenth Amendments. *See id.* at 2633–34.

At issue in this case is Section 2 of the VRA, which proscribes vote dilution whereby a class of citizens has "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301. Congress enacted Section 2 to help effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall be denied or abridged on account of race. *See Voinovich v. Quilter*, 507 U.S. 146, 152 (1993). The

VRA's text explicitly states that Section 2 does not establish a right to proportional representation. 52 U.S.C. § 10301(b).

In 1982, Congress amended the VRA in direct response to the U.S. Supreme Court's decision in *Mobile v. Bolden*, 446 U.S. 55 (1980), which required suits brought under the old Section 2 to meet the subjective-intent standard of proof. *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986). The amended (and current) "results test" of Section 2 hinges on a consideration of the totality of the circumstances surrounding the challenged election procedure, such that a court focuses on objective facets of the local political context instead of probing the minds of legislators. *See* Roy A. McKenzie & Ronald A. Krauss, *Section 2 of the Voting Rights Act: An Analysis of the 1982 Amendment*, 19 Harv. C.R.-C.L. L. Rev. 155, 191–92 (1984).

### ii.  The *Gingles* Analysis

This Court applies a two-step framework in analyzing Section 2 claims. *NAACP v. Fordice*, 252 F.3d 361, 365 (5th Cir. 2001). First, Plaintiffs challenging an electoral mechanism must satisfy the three preconditions for a Section 2 claim articulated by the U.S. Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986). *See id.* Second, Plaintiffs must prove that, based on the "totality of the circumstances," the challenged plan results in the denial of the right to vote based on color or race in violation of Section 2. *Fordice*, 252 F.3d at 366.

To satisfy the threshold *Gingles* inquiry, Plaintiffs bear the burden to show, by a preponderance of the evidence, that: (1) the affected minority group is

sufficiently large and geographically compact to constitute a voting age majority in a district; (2) the minority group is politically cohesive; *and* (3) the majority group votes sufficiently as a bloc that it is able—in the absence of special circumstances—usually to defeat the minority group's preferred candidate. *See id.* (emphasis added) (*Gingles*, 478 U.S. at 50–51).

If Plaintiffs are able to meet all three preconditions of the threshold *Gingles* test, the Court properly turns to evaluate the totality of the circumstances, which include facets of the local political context enumerated in the Senate Judiciary Committee report accompanying the 1982 amendments to the Voting Rights Act. *See Rodriguez v. Bexar Cnty., Tex.*, 385 F.3d 853, 869 (5th Cir. 2004). These factors include:

(1) the history of official voting-related discrimination in the state or political subdivision;
(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;
(3) the extent to which the state or political subdivision has used voting practices or procedures that may enhance[1] the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet voting[2];

[1] The Senate Report lists this third factor as practices or procedures that "*tend to* enhance" the opportunity for discrimination against the minority group, language quoted in one portion of *Gingles*. *See* 478 U.S. at 45 (emphasis added). In another portion of *Gingles*, the Supreme Court characterized this factor as being practices or procedures that "*may* enhance" such discrimination. *See id.* at 37 (emphasis added). The Fifth Circuit consistently adopts the "may enhance" language for this third factor. *See, e.g.*, *Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1147 (5th Cir. 1993); *Citizens for a Better Gretna v. City of Gretna, La.*, 834 F.2d 496, 498 (5th Cir. 1987). Accordingly, this Court also uses the "may enhance" standard.

[2] Bullet voting, also known as single-shot voting, refers to a voting practice in which voters are allowed to cast fewer than all of their votes. For instance, in an at-large election for five council members, a voter may have five votes. If the voter casts only one of those votes—that is, votes for only one person, and does not use her other votes—then she has engaged in bullet voting. An anti-bullet voting provision prohibits this practice. *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1113 n.3 (5th Cir. 1991).

(4) the exclusion of members of the minority group from candidate slating processes;

(5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

(6) the use of overt or subtle racial appeals in political campaigns; and

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

S.Rep. No. 97-417, 97th Cong., 2d Sess. (1982), pp. 28–29. The Judiciary Committee also noted that a court could consider additional factors, such as:

(8) whether there is a lack of responsiveness on the part of elected officials to the particularized needs of minority group members; and

(9) where the policy underlying the state or political subdivision's use of the challenged standard, practice, or procedure is tenuous.

*Id.* The Judiciary Committee report describes this list of factors as neither exclusive nor comprehensive. Moreoever, a plaintiff need not prove any particular number or a majority of these factors in order to succeed in a vote dilution claim. *Id.* at 29. Instead of a mechanical point-counting assessment, courts must make a "searching practical evaluation of the [locality]'s 'past and present reality'" when evaluating the totality of the circumstances under the *Gingles* test. *Id.* at 30.

## B. The Fourteenth and Fifteenth Amendments

The Fourteenth Amendment prohibits the denial of any person equal protection under the law and prohibits the enforcement of any law that abridges the privileges and immunities of a citizen of the United States. U.S. Const. amend. XIV, §§ 1, 2. A voting scheme violates the Fourteenth Amendment if it is "'conceived or operated as [a] purposeful device[] to further racial discrimination' by minimizing,

cancelling out or diluting the voting strength of racial elements in the voting population." *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (*Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971)). To succeed on a vote dilution claim, a plaintiff must show that the voting scheme has a discriminatory effect and that the legislature acted with a discriminatory purpose. *Backus v. South Carolina*, 857 F. Supp. 2d 553, 568 (D.S.C. 2012), *aff'd*, ___ U.S. ___, 133 S. Ct. 156 (2012). To prove discriminatory effect, a plaintiff must prove that "the racial minority's voting potential has been minimized or cancelled out or the political strength of such a group adversely affected." *Id.* at 567–68 (alterations and citations omitted). To prove discriminatory purpose, a plaintiff need not advance direct evidence of discriminatory intent, but "discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Id.* at 568 (internal quotation marks omitted) (*Rogers v. Lodge*, 458 U.S. at 618).

The Fifteenth Amendment prohibits the abridgement or denial of the right to vote on account of race. U.S. Const. amend. XV, § 1. This Court recognizes that a vote dilution claim is also cognizable under the Fifteenth Amendment, with elements mirroring those of a vote dilution claim under the Fourteenth Amendment. *Terrebonne Parish N.A.A.C.P. v. Jindal*, No. CIV.A. 14-069-JJB, 2014 WL 3586549, at *7 (M.D. La. July 21, 2014).

## IV. BACKGROUND

Defendant St. Gabriel is an incorporated City within the Parish of Iberville. According to the 2010 census, the total non-incarcerated population of St. Gabriel is 3,144, with a racial makeup of 944 (30%) white, 2,139 (68%) black, and 61 (2%) of another race. (Ex. P-3 at p. 27).

St. Gabriel was first incorporated in 1994, as a Town. (*See* Ex. D-3, Bates No. 5). In accordance with Louisiana statute, the Town of St. Gabriel had a five-member Board of Aldermen. *See* La. R.S. § 33:382A. In the 1995 Board of Aldermen election, one white alderman and four black aldermen were elected. (*See* Ex. D-4). In the 1999 Board of Aldermen election, one white alderman and four black aldermen were elected. (*See* Ex. D-5). In both those elections, the white alderman elected was the same person, Mr. Warren Berthelot. (*See* Exs. D-4, D-5).

In August of 1999, a resolution was adopted to re-classify the Board of Aldermen to a City Council, with five council members.[3] (Ex. D-3, Bates No. 17). In 2001, St. Gabriel's total population exceeded 5,000 residents, so it was re-classified as a City pursuant to the adoption of a resolution by the Board of Aldermen. (*See* Ex. D-6, Bates Nos. 20–21); *see also* R.S. §§ 33:341, 33:342. In each of the City Council elections of 2003, 3007, and 2011, five black council members were elected. (Exs. D-7, D-9, D-11).

---

[3] Throughout this matter, in briefs and at trial, parties and witnesses used the terms "Board of Aldermen" and "aldermen" interchangeably with "City Council" and "council members," respectively. In the instant opinion, the Court classifies the political body as the Board of Alderman (whose members are aldermen) when referring to the body in existence before August 1999, and as the City Council (whose members are council members) when referring to the body in existence August 1999 and after.

Under St. Gabriel's current City Council election scheme, five council members are elected at-large by qualified voters in the City, (Tr. I at 25:2–25:8), with council members serving concurrent four-year terms, (*see* Doc. 14 at ¶ 6(h)–(l)). All candidates run together, (Tr. I at 25:17–25:19), and each voter is entitled to cast up to five votes, (*see* Tr. I at 25:6–25:8).

Plaintiff York spoke at a City Council meeting in the summer of 2014 and requested that the City change its election scheme to include single-member districts.[4] (Tr. I at 79:7–79:14). Consideration of the request was tabled, "and then after that nothing was done." (Tr. I at 89:10–89:12, 97:23–98:4). Neither Ms. York nor Mr. LeBlanc identified another City Council meeting in which they broached the topic of St. Gabriel districting.

In addition to its five council members, St. Gabriel has elected municipal positions for one mayor and one chief of police. (Ex. D-3, Bates No. 17).

## V. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court begins here by analyzing Plaintiffs' VRA Section 2 claim. Finding no Section 2 violation for reasons explained fully herein, the Court moves to analyze Plaintiffs' constitutional claims under the Fourteenth and Fifteenth Amendments. For reasons explained fully herein, the Court concludes that Plaintiffs have not met their burden of proof for their constitutional claims.

---

[4] A single-member district is one in which voters within that district elect one member from the district. *See Connor v. Johnson*, 402 U.S. 690, 691 (1971).

## A. VRA Claim

### i. Preconditions

To satisfy the threshold inquiry for a VRA Section 2 claim, Plaintiffs must show, by a preponderance of the evidence, that the following three preconditions are met: (1) the affected minority group is sufficiently large and geographically compact to constitute a voting age majority in a district; (2) the minority group is politically cohesive; and (3) the majority votes sufficiently as a bloc that it is usually able to defeat the minority group's preferred candidate. *NAACP v. Fordice*, 252 F.3d 361, 366 (5th Cir. 2001) (*Gingles*, 478 U.S. at 50–51).

### a) Precondition #1

Plaintiffs' expert, Dr. William Blair, testified that the white minority of St. Gabriel, "without question," meets the first *Gingles* precondition, that is, that whites comprise a sufficiently large and geographically compact group to constitute a majority in a single-member district. (Tr. I at 24:20–24:21). Defendant does not dispute that the first *Gingles* precondition is satisfied. (Doc. 30 at p. 8 n2).

Plaintiffs submitted as exhibits two exemplar districting plans, prepared by Dr. Blair, which would create at least one single-member district in which whites would constitute a majority of the voting-age population. (*See* Docs. 35-1, 35-2). The first plan creates five single-member districts ("five-district plan"), while the second plan creates four single-member districts and leaves one seat to be elected at large ("four-district plan"). Dr. Blair also provided plan statistics and district summaries for the exemplar plans. (Ex. P-1 at pp. 3–4, 6–7).

"A proposed district is sufficiently compact if it retains a natural sense of community." *St. Bernard Citizens For Better Gov't v. St. Bernard Parish Sch. Bd.*, No. CIV.A. 02-2209, 2002 WL 2022589, at *5 (E.D. La. Aug. 26, 2002). In adjudging compactness a Court looks to whether a district is "compact and reasonable in size and shape." *Id.*

After reviewing both exemplar districting plans and accompanying plan data, the Court finds that Plaintiffs' proposed five-district and four-district plans depict districts with roughly equal populations, in which at least one district would result in whites constituting a majority of the voting-age population. The proposed majority-white districts, District 2 in the five-district plan and District 2 in the four-district plan, appear to be compact and reasonable in size and shape.[5] Accordingly, the Court concludes that Plaintiffs have established by a preponderance of the evidence that the first *Gingles* precondition is satisfied.

### b) Precondition #2

Next, Plaintiffs must show that the white minority group of St. Gabriel is politically cohesive. The Court inquires into the existence of "racially polarized voting" in order "to ascertain whether minority group members constitute a politically cohesive unit." *Gingles*, 478 U.S. at 56. The U.S. Supreme Court established that racial polarization exists where there is "a consistent relationship between the race of the voter and the way in which the voter votes." (internal

---

[5] The Court raises a question as to whether the proposed District 3 in the five-district plan is sufficiently compact, or reasonable in size and shape. In this exemplar plan, the geographical shape of District 3 constricts significantly in the middle area before spreading out again in the southern area of the proposed district. (*See* Doc. 35-1). The first *Gingles* precondition, however, only requires the Court to examine the compactness of District 2, in which whites would comprise the majority.

quotation marks and alterations omitted). *Id.* at 53 n.21. In *Gingles*, the Court did not provide a definitive metric of "political cohesiveness" but explained that "[a] showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim." *Id.* at 56. In terms of data analysis, "a pattern of racial bloc voting over a period of time is 'more probative' of political cohesiveness than a single election." *Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386, 1399 (S.D. Miss. 1992), *aff'd*, 994 F.2d 1143 (5th Cir. 1993).

Both Plaintiffs' expert, Dr. William Blair, and Defendant's expert, Dr. John Alford,[6] relied on the accepted Ecological Inference (EI) technique to conduct their analyses of St. Gabriel's voter cohesion and voter polarization. The EI technique is a variation of the traditional ecological regression analysis, incorporating information to create a "method of bounds" for each voting precinct to produce a more accurate estimate of the relationship between voter race and candidate choice. (*See* Tr. I at 50:12–51:24; P-3 at p. 29; Ex. D-12, Bates Nos. 51–52).[7] Dr. Alford testified that he believes he and Dr. Blair disagree about the underlying data, although they do not disagree about how to interpret it, for they reach the same conclusions when they view the same data patterns. (*See* Tr. I at 184:17–184:18). With the same basic

---

[6] The parties stipulated that both experts were qualified in the areas of redistricting, elections, political representation, voting behavior, statistical methods, statistic analysis, and applying statistical analysis in the issues raised in election districts. (*See* Doc. 31 at p. 2 n.5). The Court accepted Dr. Blair and Dr. Alford as experts in the fields proposed by the parties. (*See* Tr. I at 23:21–23:22, 157:17–157:18).

[7] Dr. Alford stated that he also performed, as a supplement, the more traditional ecological regression analysis in this matter because it is easier to understand and "useful to have" as a standard, although Dr. Alford stated that the two methods of EI and ecological regression tend to reach similar and non-contradictory results. (Tr. I at 159:24–160:8).

methodology and similar application, the two experts share substantial areas of agreement in their conclusions regarding racial polarization, with occasional divergences.

With respect to the types of elections analyzed, the Court first proceeds to analyze the endogenous elections of the St. Gabriel City Council. At the outset, the Court must clarify that it rejects the parties' proffered distinction between an endogenous versus an exogenous election. Both Plaintiffs and Defendant characterize exogenous elections are those whose electorate boundaries are not coterminous with St. Gabriel, though they may contain St. Gabriel. The Court knows of no controlling authority supporting the experts' definition of "exogenous." The U.S. Court of Appeals for the Fifth Circuit has held that, in the context of vote dilution cases, the term "exogenous elections" refers to elections for an *office* other than the one at issue, regardless of whether the office's elections draw from the same electorate. *See, e.g.*, *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1397 (5th Cir. 1996) (exogenous elections described as "those not involving the particular office at issue"); *E. Jefferson Coal. for Leadership & Dev. v. Parish of Jefferson*, 926 F.2d 487, 492 (5th Cir. 1991) (exogenous elections defined as "elections for offices other than Parish Council" in case challenging parish council's councilmanic structure); *Magnolia Bar Ass'n, Inc. v. Lee*, 793 F. Supp. 1386, 1399 (S.D. Miss. 1992), *aff'd*, 994 F.2d 1143 (5th Cir. 1993) (exogenous elections explained as "elections involving other offices" from the office in issue). Accordingly, although the Chief of Police elections are wholly contained in St. Gabriel, the Court rejects the

parties' classification of the Chief of Police elections as endogenous. The Court deems St. Gabriel's City Council elections (and Board of Aldermen elections, as they were formerly known) as the only proper endogenous elections in this matter.

Endogenous elections are, understandably, more probative to determining whether racially polarized voting exists in St. Gabriel's City Council elections. Because of St. Gabriel's relatively recent incorporation, there is a scarcity of endogenous election data. Here, the parties have procured reports containing voting data from only three City Council (formerly Board of Aldermen) elections of 1999, 2003, and 2007.[8] The Fifth Circuit has held that a district court, while not

---

[8]  At multiple stages in this litigation, Plaintiffs' counsel argued that *Gingles* stands for the proposition that the race of the candidates does not control the determination of the minority voters' candidates of choice. (*See, e.g.*, Doc. 32 at pp. 3–4; Tr. II at 27:2–28:7). Indeed, Justice Brennan wrote in *Gingles* that "[u]nder § 2, it is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate, that is important. . . . only the race of the voter, not the race of the candidate, is relevant to vote dilution analysis." *Gingles*, 478 U.S. at 68. However, a careful reading of *Gingles* reveals that, in fact, this portion of Justice Brennan's opinion was not adopted by a majority—but only a plurality—of the Supreme Court, and thus does not comprise part of the Court's holding. *See id.* at 32 (specifying that only Justices Marshall, Blackmun, and Stevens joined in Part III–C of the opinion, in which Justice Brennan opined that the race of the candidate is not important to a vote dilution analysis). Justice White specifically disavowed this portion of Justice Brennan's opinion, raising concerns about the dangers of promoting "interest-group politics rather than a rule hedging against racial discrimination." *Id.* at 83.

The Fifth Circuit has expounded upon how this Court should interpret the relationship between the race of the voter and the race of the candidate: "[I]mplicit in the *Gingles* holding is the notion that [minority] preference is determined from elections which offer the choice of a [minority] candidate. The various *Gingles* concurring and dissenting opinions do not consider evidence of elections in which only [majority race individuals] were candidates. Hence, neither do we." *Citizens for a Better Gretna v. City of Gretna, La.*, 834 F.2d 496, 503–04 (5th Cir. 1987). *See also E. Jefferson Coal. for Leadership & Dev.*, 926 F.2d at 493 (affirming district court decision to limit its investigation of racial polarization to elections involving minority candidates).

Dr. Blair, when called by Plaintiffs as a rebuttal witness, began to testify about his independent analysis of the 2011 election. (Tr. II at 11:16–11:24). Defendant objected to the introduction of such evidence, which was not disclosed in pre-trial discovery or expert reports, nor elicited in Dr. Blair's direct- or cross-examination. (Tr. II at 11:24–12:10). The Court permitted such testimony by Dr. Blair only insofar as the 2011 elections had previously been referenced in a tangential way. (Tr. II at 14:3–14:11). Therefore, despite Plaintiffs' attempt to introduce expert testimony regarding the candidates of choice among blacks and whites in the 2011 City Council election, the Court firmly refuses to consider evidence regarding the 2011 City Council election, in which no minority white candidate ran, in its vote dilution analysis.

permitted to find racially polarized voting by analyzing exogenous elections alone, properly considers exogenous elections as additional evidence of bloc voting when there is a sparseness of available data, as is the case here. *Citizens for a Better Gretna v. City of Gretna, La.*, 834 F.2d 496, 502 (5th Cir. 1987).

### 1) *Endogenous Elections*

Among the three endogenous elections examined in their reports, the experts reach the same conclusions as to two. Dr. Blair and Dr. Alford agree that the 1999 Board of Aldermen election *did not* exhibit minority voter cohesion. (*See* Tr. I at 47:14–47:17; Ex. D-12, Bates No. 53). The experts also concur that the 2003 City Council election *did* exhibit white minority voter cohesion. (*See* Tr. I at 31:7–31:13; Ex. D-12, Bates No. 54). Although neither party submitted an expert report that contained 1995 Board of Aldermen election data, in which a white minority candidate ran and won, Dr. Alford testified under direct examination that he analyzed the 1995 election and concluded that it did not demonstrate white cohesive voting. (*See* Tr. I at 167:13–167:21). Plaintiffs did not rebut Dr. Alford's conclusion regarding the 1995 election at trial or in their post-trial brief.

Plaintiffs argue that the sole victories of a white person in Board of Aldermen or City Council elections—by Mr. Warren Bertholet, who won in 1995 and 1999— were attributable to the support of an African American mayor, Mayor George Grace. Mr. Melvin Lodge testified that it was "common knowledge in the community" that Mayor Grace supported Mr. Bertholet throughout Mr. Bertholet's two terms. (Tr. I at 108:22–109:3). Dr. Blair testified that Mr. Bertholet was

"absolutely" a candidate of choice among black voters. (Tr. I at 44:3–44:6). The Court does not find Plaintiffs' argument persuasive on the issue of minority voter cohesion. The nature of at-large voting is such that candidates are incentivized to appeal to the entire electorate. The fact that Mr. Bertholet was a candidate of choice among a cohesion of black majority voters does not detract from the fact that he was also a candidate of choice among a cohesion of white minority voters.

Where the experts reach different conclusions in the 2007 City Council, the Court delves further to assess the validity of the different methodologies employed by Dr. Blair and Dr. Alford and, if necessary, make credibility determinations regarding the experts. For the 2007 City Council election, Dr. Blair's data analysis provides that about 71.75% of the white minority vote was distributed among their top five candidates of choice, two of which were white: Ambeau (B), Miller (W), White (B), Snelson (W), Allen (B). (*See* Ex. P-3 at p. 37, tbl.1.1). For the same election, Dr. Alford's analysis provides that only about 36.09% of the white minority vote was distributed among their top five candidates of choice, none of which were white: Alexander (B), Allen (B), Ambeau (B), Green (B), and White (B). (*See* Ex. D-12, Bates No. 61, tbl.1). According to the numbers produced by Dr. Blair's analysis, there is substantial cohesion among white voters among their top five candidates, while Dr. Alford's analysis demonstrates far less concentration of minority white voter support for particular candidates.

The disparities between the experts' analyses, both of which employed the EI methodology, apparently hinged on differing treatment of what the experts termed

unused votes or under-voting. (Tr. I at 182:17–182:20; Ex. D-12, Bates No. 52). Part of the discrepancy is attributable to individuals who show up at the polls but do not use all their potential votes, while another part is due to the fact that the available election results data, obtained from the Louisiana Secretary of State, keep early voting numbers as a separate category from the individual precincts, but roll the early voting figures into the participation figures, such that there is no corresponding candidate choice data for the absentee voting group. (Tr. I at 58:12–58:25, 168:6–168:8). The experts agreed that the asymmetrical treatment of early voting numbers complicates the EI analysis. (Tr. I at 57:19–58:2, 169:1–169:4).

Dr. Blair testified that in the 2007 City Council elections, early voting comprised approximately seven percent of total voting. (Tr. I at 59:25–60:5). Dr. Blair observed that the absentee votes "mirror[ed] quite closely the majority vote choice in St. Gabriel," (Tr. I at 59:7–59:9), and stated that he removed the early voting numbers for his analysis, (Tr. I at 60:17–60:20). Dr. Alford, in contrast, testified that he employed the EI analysis to model the early voting mismatch, such that it was built into the estimation technique. (Tr. I at 169:3–169:17). Dr. Alford opined that "there is no good way to do this estimate" of distributing the unused early votes, and he believed his method is only "modestly better" than Dr. Blair's. (Tr. I at 171:10–171:12).

The parties did not submit for the record election data they obtained from the Louisiana Secretary of State. Based on the experts' testimony, however, it appears that there was no accurate way to isolate the early voting data, requiring the

experts to, in some manner, estimate early voting patterns for their EI analyses. The record does not contain enough evidence, nor have the parties directed the Court to applicable legal authority, enabling the Court to adopt either expert's method of handling the early voting data.

Insofar as Plaintiffs' and Defendant's experts reach different conclusions regarding the 2007 City Council election for reasons other than their distinct treatment of early voting data, the Court is not sufficiently convinced of the accuracy of either expert's analysis regarding minority white political cohesiveness. Both experts noted that they encountered significant methodological challenges in performing their EI analyses of St. Gabriel's City Council elections, due to the relatively high number of votes afforded to each voter, the relatively large pool of candidates, and the small number of precincts. (*See* Tr. I at 52:18–53:18, 172:5–172:25).

Plaintiffs argue that Dr. Alford's analysis is less reliable than Dr. Blair's, asserting Dr. Alford's undue reliance on a homogeneous precinct analysis of Precinct 12. (*See* Doc. 32 at p. 6). Homogeneous precinct analysis is another way to ascertain the relationship between voter race and candidate of choice, traditionally used as supplementary information to the EI analysis. (*See* Tr. I at 36:10–36:16). The experts examined St. Gabriel's precincts, of which there are only three: Precinct 11, which is over 95% African American and comprises over 42% of the electorate, (Tr. I at 36:22–36:25, 37:12–37:15); Precinct 12, which is about 75–80% white but only contains about 1.5% of the electorate, (Tr. I at 38:9–38:19), and; Precinct 10,

which is about 60% African American and 40% white or other race, and contains the remainder of the electorate, (*see* Tr. I at 38:7–38:9).

Both experts conducted a homogeneous precinct analysis to supplement their EI analyses. Dr. Alford stated in his report that his conclusion of no white voter cohesion in the 2007 election is compatible with the homogenous precinct analysis he conducted for Precinct 12. (*See* Ex. D-12, Bates No. 55). Plaintiffs argue that homogenous precinct data for Precinct 12 has discounted probative value for its small sample size relative to the overall jurisdiction. Indeed, Dr. Alford testified that he did not afford much probative weight to homogenous precinct data in his analysis. (Tr. I at 161:15–161:19). Dr. Blair's report contained a table of homogeneous precincts data, solely for Precinct 11, which has a greater population and is thus more probative. (Ex. P-3 at p. 40, tbl.1.4). Yet Dr. Blair testified that in his homogeneous precinct analysis, he, too, considered Precinct 12 despite the fact that it is a small precinct. (Tr. I at 53:4–53:12). It appears that both experts considered Precinct 12 when examining homogeneous precinct data, while both recognizing that such precinct data were limited in probative value. The experts did not provide more specific information about how they utilized St. Gabriel's homogeneous precinct data. Accordingly, the Court is unconvinced by Plaintiffs' argument that Dr. Alford's analysis was flawed merely because it took into account Precinct 12.

There is not a sufficient basis in the record for the Court to adopt either expert's EI methodology in this matter, or to make a determination as to the

experts' relative credibility, particularly given the failure of both experts to sufficiently elucidate their methodologies for treating the early voting mismatch, coupled with the scarcity of voting data available for St. Gabriel.

The statistical evidence is inconclusive as to whether minority white political cohesion existed in St. Gabriel's 2007 City Council election. Nonetheless, the Fifth Circuit has held that a court may make a determination of political cohesion without relying on statistical evidence. *See Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1118 (5th Cir. 1991). Based on the areas of no disagreement between the parties regarding the endogenous elections, the Court concludes that the 1995 and 1999 Board of Aldermen elections *did not* exhibit minority white political cohesion, and the 2003 City Council election *did* exhibit minority white political cohesion.

### 2) *Exogenous Elections*

A court is not required to consider exogenous elections. Indeed, the Fifth Circuit has deliberately avoided declaring that election results from outside the challenged electoral system are always appropriate for consideration. *See Citizens for a Better Gretna*, 834 F.2d at 503. The Court has already made findings as to four endogenous elections in this matter *supra*, and, indeed, the Fifth Circuit has upheld district court findings of political cohesion based on analyses of only four elections. *See League of United Latin Am. Citizens #4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 845 (5th Cir. 1997), *aff'g League of United Latin Am. Citizens # 4552 v. Roscoe Indep. Sch. Dist.*, No. CIV.A.1:94-CV-104-C, 1996 WL 453584 (N.D. Tex.

May 14, 1996) (voting patterns adduced from four contested races of school district's board of trustees).

The Court need not address all the exogenous election data presented by the parties if it does not find them all probative. The experts performed their own EI analyses for historical parish, state, and federal election data of Iberville Parish, which contains St. Gabriel but whose boundaries are not coterminous with St. Gabriel. (*See* Ex. P–3 at pp. 41–42, tbls.2,3; Ex. D–12, Bates Nos. 63–64, tbls. 3, 4). Plaintiffs' expert, Dr. Blair, divided the Iberville Parish elections by "Eastbank" and "Westbank"; the Eastbank contains St. Gabriel, but 25% of its population is located outside of St. Gabriel. (*See* Ex. P–3 at p. 28). Dr. Blair did not specify his basis for selecting particular Iberville Parish elections to include in his report. Further, both experts testified that partisan politics play a heightened role in state and federal elections, in a manner not present in local elections. (*See* Tr. I at 55:24–56:15; Ex. D-12, Bates No. 57). Accordingly, the Court declines to consider the evidence of Iberville Parish elections offered by the experts, for it does not find them sufficiently reflective of the local voting patterns at issue in this matter.

In addition to the endogenous elections, the Court considers only the exogenous elections of the 2003 and 2007 Chief of Police elections, for which voting was wholly contained in St. Gabriel and which were held at the same time as the City Council elections.[9] Here, Dr. Blair and Dr. Alford agreed that the two Chief of Police elections analyzed, from 2003 and 2007, did not exhibit white minority

---

[9] Dr. Blair specifies that he did not analyze the 1999 or 2011 Chief of Police elections because no minority candidates were in those races. (Ex. P-3 at p. 30). The experts did not analyze St. Gabriel mayoral races in their reports, nor was testimony presented at trial regarding mayoral races.

cohesion. (Ex. P-3 at p. 30; Ex. D-12, Bates No. 53). Accordingly, the Court finds that the 2003 and 2007 Chief of Police elections, the only exogenous elections under consideration, did not evidence white minority voter cohesion. As with the endogenous elections, the Court is not required to articulate its reliance on statistical evidence of racial polarization, particularly for races in which there is no dispute between the experts as to their ultimate conclusions of racial polarization. *See Westwego Citizens*, 946 F.2d at 1118.

As noted, the burden to prove the *Gingles* preconditions, by a preponderance of evidence, rests with Plaintiffs. Examining endogenous as well as exogenous elections, the Court finds that Plaintiffs have not met their burden to show that the white minority group of St. Gabriel is politically cohesive. Although it is undisputed that the 2003 City Council election exhibited white minority voter cohesion, that single endogenous election is not dispositive. "Racial polarization should be seen as an attribute not of a single election, but rather of a polity viewed over time." *See Gingles*, 478 U.S. at 57. Thus, the second *Gingles* precondition has not been satisfied.

### c) Precondition #3

For Plaintiffs to satisfy the third *Gingles* precondition, they must prove that the majority votes sufficiently as a bloc that it is usually able to defeat the minority group's preferred candidate. The standard, as articulated by the U.S. Supreme Court in *Gingles*, is such that the Court must be able to identify the minority group's preferred candidate in order to assess the satisfaction of this third

precondition. *See Gingles*, 478 U.S. at 31. Here, where the Court has found, *supra*, that the minority white group of St. Gabriel is not politically cohesive, it cannot ascertain, in the elections offered for analysis by Plaintiffs, whether the white minority had preferred candidates by which the Court may assess the fulfillment of the third precondition.

The Court is persuaded by Dr. Alford's testimony regarding the applicability of the third *Gingles* precondition in the instant matter: "[I]f you have a minority candidate who is not being supported by minority voters, then the issue of what majority voters are doing is really not relevant. . . . Majority bloc voting is important when . . . it defeats the candidate that has the cohesive support of minority voters." (Tr. I at 163:17–164:1). On cross-examination, Dr. Blair also testified that an analysis of the third precondition is predicated on a finding that the second precondition is satisfied. (Tr. I at 48:24–49:2). The third precondition, involving a finding of the usual defeat of the minority group's candidate of choice, presupposes minority cohesion with respect to a minority candidate of choice. The Court, not having found the second precondition satisfied, does not proceed to analyze the third precondition—and it need not, because all preconditions must be met in order to find a violation of VRA Section 2.

## ii. Totality of the Circumstances

Without having found all *Gingles* preconditions satisfied, the Court is not obligated to analyze the second *Gingles* prong. Nonetheless, in light of Plaintiffs' vigorous arguments regarding a holistic view of St. Gabriel's historical and political

context, the Court proceeds to discuss why Plaintiffs' claim also fails the *Gingles* totality of circumstances analysis.

### (1) History of official voting-related discrimination

Plaintiffs urge an expansive reading of this first factor, noting that "[i]n Louisiana there is actually very little a municipal government could do 'officially' to affect a minority voter's ability to vote." (Doc. 32 at p. 7). Plaintiffs go on to note that the establishment of City Council election districts is within St. Gabriel's authority, but "in the one area that the City had the ability to exert 'official' action, it chose to reject the request of minority voters." (*Id.* at p. 8). Insofar as Plaintiff is arguing that the act of the City's rejection of Plaintiffs' proposed districting plan is somehow indicative of a history of official voting-related discrimination, the Court is wholly unpersuaded. Plaintiffs testified that they had no knowledge of any white persons in St. Gabriel having been denied the right to vote or prevented from qualifying to run for office on account of race. (Tr. I at 83:24–84:8, 101:25–102:8). The Court can find no evidence in the record to establish that St. Gabriel has a history of official voting-related discrimination against members of the white minority. Thus, the Court finds that the first factor has not been met.

### (2) Extent to which voting in the elections is racially polarized

As explained in its discussion of the *Gingles* preconditions *supra*, the Plaintiffs have only shown racial polarization by white minority voter cohesion in one City Council election, while the uncontroverted evidence is that three other City Council (or Board of Aldermen) elections were shown to *not* have exhibited white

minority voter cohesion. The evidence in the record regarding racial polarization is, at best, inconclusive.

### (3) Extent to which voting practices or procedures may enhance the opportunity for discrimination against the minority group

In its report accompanying the 1982 VRA amendments, Congress offered examples of specific procedures that could be indicative of voting practices or procedures that may enhance the opportunity for discrimination against the minority group: unusually large election districts, majority-vote requirements, and prohibitions against bullet (single-shot) voting. Here, Plaintiffs do not contend that any of these three practices or procedures is used in the current St. Gabriel City Council election process.

Although it is not necessary for the Court to find the presence of one or more of the practices or procedures specifically enumerated by Congress in order to find this third factor satisfied, Plaintiffs do not direct the Court to *any* specific characteristics of the St. Gabriel City Council election system that "may enhance the opportunity for discrimination" against the minority whites, aside from contending that the existence of an at-large voting system is in itself discriminatory. Plaintiffs merely state, in a conclusory fashion, that "[t]here is no legitimate argument that an election scheme such as that in place in St. Gabriel does not meet Factor 3." (Doc. 32 at p. 8). Plaintiffs appear to be engaging in a circular argument, in which they attempt to satisfy the third factor here by claiming that the entire *Gingles* test has already been met. Plaintiffs have provided no *concrete* basis for the Court to find in Plaintiffs' favor on this factor. The third factor has not been met.

**(4)** **Exclusion of members of the minority group from candidate slating processes**

Plaintiffs acknowledge that there is no formal slating process in St. Gabriel. (Doc. 32 at p. 9). Accordingly, this fourth factor has not been met.

**(5)** **Extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process**

Plaintiffs admit this factor has not been met "in the traditional or historical sense." (Doc. 32 at p. 9). Plaintiffs have made no assertions of discrimination against white minority members in the areas of education or health within St. Gabriel. Plaintiffs, however, state that city hiring statistics are "relevant" for consideration of this factor. At trial, Mayor Lionel Johnson testified that of the approximately sixty-five current city employees, including police officers, only one is white. (Tr. I at 121:6–121:10). Mayor Johnson also testified that St. Gabriel has no program to address the racial disparity. (Tr. I at 127:11–127:15).

To the extent that Plaintiffs contend that such city employment statistics serve as evidence of whites bearing the effects of employment discrimination in St. Gabriel, the Court disagrees. Mayor Johnson testified that, since he began his mayoral term in 2011, only one white individual has ever applied to work for the city. (Tr. I at 133:4–133:6). He further testified that the majority of City employment positions are labor-intensive jobs. (Tr. I at 132:23–133:2). Considering Mayor Johnson's unchallenged testimony that only one white person has applied for a job with St. Gabriel since 2011, the Court does not find that the low number of

whites currently employed by St. Gabriel, in itself, constitutes discrimination against whites in city employment hiring. There is insufficient evidence in the record to attribute the low number of white city employees to anything other than a scarcity of white applicants seeking positions, most likely labor-intensive positions, with St. Gabriel. Plaintiffs have presented no evidence that any white person has been prevented or discouraged from applying to work as a City employee. Plaintiffs, for example, have not directed the Court to any administrative complaint or lawsuit filing from any agency, court, or tribunal in which any individual alleged that St. Gabriel engaged in discriminatory hiring practices. Plaintiffs point to no authority—nor is the Court aware of any—that would support Plaintiffs' suggestion that racial discrimination inheres in St. Gabriel's mere failure to institute a recruitment outreach program for minority white city employees.

Finding that Plaintiffs have not shown that minority white individuals bear effects of discrimination in education, employment, health, or any other area such that whites would have decreased ability to participate effectively in the political process, the Court determines that this fifth factor is not satisfied.

**(6)     Use of overt or subtle racial appeals in political campaigns**

Plaintiffs concede, "This factor does not appear applicable in St. Gabriel." (Doc. 32 at p. 9). Indeed, during trial, Plaintiffs testified under cross-examination that they did not perceive racial appeals, nor indications of racial motivation, in political campaigns for St. Gabriel City Council. (Tr. I at 83:1–83:3, 102:15–102:18). Additionally, Mr. Melvin Lodge, Mayor Lionel Johnson, Councilman Melvin Lee

Hasten, and Police Chief Kevin Ambeau all testified that they did not perceive any racial appeals in past municipal elections. (*See* Tr. I at 114:10–114:14, 132:3–132:7, 143:10–143:13; Tr. II at 23:1–23:5). Plaintiffs presented no evidence to the contrary. Accordingly, the Court finds this sixth factor has not been met.

### (7) Extent to which members of the minority group have been elected to public office in the jurisdiction

Plaintiffs argue that "there can be no real debate" on this factor, as only one white person, Mr. Warren Bertholet, has been elected to municipal office within the City of St. Gabriel. (Doc. 32 at p. 9). Mr. Bertholet was elected as a city councilmember in two of the five City Council elections in St. Gabriel's history. (Exs. D-4, D-5).

The Court agrees with Plaintiffs that white minority members have not been elected to citywide public office to a considerable extent. It notes, however, that the VRA is explicit in warning that Section 2 does not establish a right to proportional representation. 52 U.S.C. § 10301(b). The Court also emphasizes that the data shows that white minority members have not been putting themselves in the running for such positions. There has been a dearth of white candidates in St. Gabriel. In 2003, there were two white City Council candidates out of sixteen on the ballot, and one white Chief of Police candidate out of four. (*See* Ex. P-3 at p. 37, tbl.1.1; Ex. P-1 at p. 38, tbl.1.2). In 2007, there were two white candidates out of twenty on the City Council ballot, and one white candidate out of five on the Chief of Police ballot. *See* Ex. P-3 at p. 37, tbl.1.1; Ex. P-1 at p. 38, tbl.1.2). In 2011, no minority white individuals were qualified candidates for either City Council or

Chief of Police. (*See* Tr. I at 67:4–67:5; Ex. P-3 at p. 30, tbl.1.2). As reviewed *supra*, Plaintiffs testified that they had no knowledge of any white candidates who desired to run for office in St. Gabriel but were prevented from doing so. (Tr. I at 83:24–84:8, 101:25–102:8).

Accordingly, the Court finds that this seventh factor has been satisfied, but it is careful to avoid overstating the degree of the non-election of whites, given the low rate of white candidacy in St. Gabriel elections.

### (8) Whether there is a lack of responsiveness on the part of elected officials to the particularized needs of minority group members

Plaintiff York testified that she does not feel "comfortable" going to council members. (Tr. I at 86:19–88:21). Yet, when asked to be more precise about the nature of her needs, Ms. York testified that she has never specifically asked a council member to do something she believed it was important for an elected representative to do. (Tr. I at 87:2–87:10). Apart from her proposal for single-member districts in St. Gabriel at issue in the instant case, York has never approached council members with a request. (Tr. I at 88:3–88:7).

Plaintiff LeBlanc testified that he submitted two work orders to City Hall regarding the drainage on his home property, in which "nothing was ever done." (Tr. I at 93:8–93:11). He stated, however, that he lives on Louisiana Highway 74, a state highway, (Tr. I at 100:9–100:13), and does not know who owns the lot on the side of his house from which water drains onto his property, (Tr. I at 100:17–101:5). Mayor Johnson testified that St. Gabriel has no obligation to maintain or repair the

drainage ditches on Louisiana Highway 74, and such maintenance is "a state issue." (Tr. I at 131:8–131:14). Absent any evidence to contradict Mayor Johnson's testimony, the Court is left to conclude that St. Gabriel was not responsible for fixing Mr. LeBlanc's home drainage problems, and therefore a failure to fix such problems cannot be attributed to a lack of responsiveness by St. Gabriel's elected officials.

St. Gabriel officials have no ability to be responsive to needs that are not within the scope of their authority to address, nor needs they have no reason to know exist. Further, the Court has not been presented with any evidence that any such failure to address Plaintiffs' concerns is based on Plaintiffs' race. Notwithstanding testimony elicited regarding what would seem to go toward the unresponsiveness of city councilmembers, Plaintiffs concede there was no testimony regarding "particularized needs" of white minority citizens of St. Gabriel. (Doc. 32 at p. 10). Therefore, the eighth factor has not been met.

### (9) Whether the policy underlying the use of the challenged practice or procedure is tenuous

Plaintiffs argue that Defendant "presented no evidence" that the policy underlying St. Gabriel's current at-large system "furthered any interest whatsoever." (Doc. 32 at p. 10). Because an at-large election system is not a *per se* violation of the VRA or the U.S. Constitution, the Court is compelled to clarify that the burden is on Plaintiffs to show that this factor is satisfied, not on Defendant to show that it is not satisfied. The Court is unwilling to regard St. Gabriel's current

City Council at-large voting procedure as presumptively tenuous, such that the burden would fall on Defendant to articulate a legitimate reason for its use.

In support of their argument on this factor, Plaintiffs point to Councilman Hasten's testimony that he believed the enactment of district voting procedures for City Council would be "the right thing to do." (*See* Doc. 32 at p. 10). But when asked at trial to articulate why he felt this way, Councilman Hasten did not provide more clarity beyond: "When you feel something is right, it might not be right, but I feel fairness for rightness. . . . I'm just what I believe in and some of the values I came up with." (Tr. I at 142:13–142:17). Mayor Johnson, too, expressed his personal view that he favors a City Council districting plan because he believes "it may be the right thing to do." (Tr. I at 126:22–126:23).

The Court appreciates the fact that some elected city officials favor a districting plan over the current at-large system, but does not find that such testimony shows that the current system is based on a tenuous policy. Louisiana law specifically permits the current at-large system for electing St. Gabriel councilmembers. *See* La. R.S. §§ 33:382D, 33:343A(2). Further, in 1996, the U.S. Department of Justice's Civil Rights Division issued a letter of no objection to St. Gabriel's at-large aldermen election plan. (*See* Ex. D-3, Bates No. 16). The evidence demonstrates that St. Gabriel uses an at-large system so that each City council member will, in effect, represent every resident within St. Gabriel. Plaintiffs have not identified any concrete basis for asserting that a tenuous policy undergirds the current at-large system. Thus, the Court finds this ninth factor is not met.

**(10)   Additional considerations**

Congress was clear that the Court should not treat as exhaustive the nine above-listed factors when evaluating the totality of the circumstances. S.Rep. No. 97-417, 97th Cong., 2d Sess. (1982), pp. 28–29. Accordingly, the Court contemplates an additional consideration raised by Plaintiff: the "subjective thought of the Plaintiffs that they do not feel as though they are being represented."[10] (Doc. 32 at p. 9).

At trial, both Ms. York and Mr. LeBlanc testified that they do not feel "comfortable" approaching St. Gabriel council members. (Tr. I at 86:19–86:21, 98:22). Ms. York expressed her belief that a districting plan would grant her "a voice in my government" and "an opportunity to have someone who will represent me." (Tr. I at 79:16–79:20).

The Court emphasizes that citizens themselves must play an active role in ensuring that their elected representatives adequately represent their interests. According to Dr. Blair, the voter turnout for white minority voters of St. Gabriel is "abysmal." (Tr. I at 67:20). In St. Gabriel City Council elections, white voter turnout decreased from 51.53% in 2003 to 36.82% in 2011. (Ex. P-3 at p. 39). In contrast, black voter turnout increased from 70.80% to 84.50% during that same period. (*Id.*). Plaintiffs contend that the "[u]nusually low turnout among White voters in St. Gabriel" is "symbolic of the exclusion that the White residents feel with regard to

---

[10] In their post-trial briefing, Plaintiffs put forth this argument under the sixth factor regarding racial appeals in political campaigns. (*See* Doc. 32 at p. 9). The Court, however, finds such an argument to be misplaced under that factor and under the other factors specifically enumerated by Congress.

their municipal government and the hopelessness that they feel in regard to the at-large electoral system in place." (Doc. 18 at p. 16).

In addition, white minority individuals run for City Council at a disproportionately low rate. As reviewed *supra*, in 2003, there were only two white candidates out of sixteen qualified on the ballot; in 2007, there were two white candidates out of twenty qualified on the ballot. (*See* Ex. P-3 at p. 37, tbl.1.1). In 2011, no white individuals ran for City Council. Plaintiffs York and LeBlanc both testified that they have no knowledge of any white individual being discouraged from running for office or otherwise prevented from qualifying to run. (Tr. I at 83:24–84:8, 101:25–102:8).

Moreover, Mr. LeBlanc testified that he does not know who his City Council representatives are and has taken no steps to ascertain their identities. (Tr. I at 102:9–102:14). Although Mr. LeBlanc has participated in St. Gabriel elections since 2003, (Tr. I at 93:12–93:18), he testified that it was not until only recently, after December of 2013, that he realized that all council members ran at large, (Tr. I at 93:19–93:23).

Plaintiffs seem to expect the Court to infer that low white voter turnout in St. Gabriel is due to whites believing that their individual votes do not matter in an at-large system. Plaintiffs also urge the Court to assume that white candidates would run for City Council elections if they would be better assured of success with at least one majority-white district in St. Gabriel. Even setting aside for a moment the Court's refusal to make several logical leaps across gaps in the record where simply

no evidence exists to support Plaintiffs' contentions, the Court must underscore that the VRA does not authorize judicial relief in the absence of a showing that minority needs and concerns are not being adequately addressed through participation in the existing political processes. Put another way, the VRA is not intended to provide a counterbalance for widespread political apathy of a racial minority.

The Court does not doubt the commitment and sincerity of Plaintiffs in seeking a City Council that they believe better represents their interests. Yet Plaintiffs have not demonstrated that the low white voter turnout or low rate of white candidacy for City Council elections is attributable to the white citizens of St. Gabriel having less *opportunity*—as opposed to merely less inclination—to participate in the political process and elect representatives of their choice. Thus, the Court does not find the "subjective thought" of members of the white minority who are "not feeling as though they are represented" to be a compelling factor in the totality of circumstances analysis.

In sum, the Court does not find any factors present in the *Gingles* analysis of this matter's totality of circumstances analysis, *except* the seventh factor: the low extent to which white minority individuals have been elected to public office in St. Gabriel. However, when the Court takes into account the context of St. Gabriel elections—in which very few white individuals have chosen to run for office, without a showing that whites have been prevented from running—it does not find sufficient evidence to conclude that St. Gabriel's at-large system results in the denial of the right to vote based on race in violation of Section 2 of the VRA.

### B. Fourteenth and Fifteenth Amendment Claims

Plaintiffs claim that the current at-large election system for the St. Gabriel City Council violates the Fourteenth and Fifteenth Amendments to the U.S. Constitution. The U.S. Supreme Court has repeatedly held that at-large voting schemes are not *per se* unconstitutional, despite challenges to such schemes based on "their tendency to submerge minorities and to overrepresent the winning party." *Rogers v. Lodge*, 458 U.S. 613, 616–17 (1982) (*Whitcomb v. Chavis*, 403 U.S. 124, 158–59 (1971)).

To prevail on either their Fourteenth or Fifteenth Amendment claims, Plaintiffs must show that the voting scheme has a discriminatory effect and was enacted with a discriminatory purpose. *See Backus v. South Carolina*, 857 F. Supp. 2d 553, 567 (D.S.C. 2012), *aff'd*, ___ U.S. ___, 133 S. Ct. 156 (2012) (Fourteenth Amendment vote dilution claim requires showing of discriminatory effect and purpose); *Terrebonne Parish N.A.A.C.P. v. Jindal*, No. CIV.A. 14-069-JJB, 2014 WL 3586549, at *7 (M.D. La. July 21, 2014) (Fifteenth Amendment vote dilution claim elements mirror those of Fourteenth Amendment vote dilution claim). Plaintiffs must also offer "a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice." *Id.*

To prove discriminatory effect, Plaintiffs must show that the white minority's voting potential has been minimized or cancelled out, or their political strength adversely affected. *See id.* at 567–68. To prove discriminatory purpose, Plaintiffs may provide direct evidence of discriminatory intent, or they may ask the Court to

infer discriminatory purpose from the totality of relevant facts. *Id.* at 568. Relevant considerations for the Court to weigh include:

> (1) whether bloc voting along racial lines exists; (2) whether minorities are excluded from the political process; (3) whether minority voter registration is low; (4) whether elected officials are unresponsive to the needs of minorities; (5) whether the minority group occupies a depressed socioeconomic status because of inferior education or employment and housing discrimination; (6) the historical backdrop leading to the passage of the redistricting legislation; (7) the specific sequence of events leading up to the challenged decision; (8) whether the redistricting body departed from the normal procedural sequence for passing redistricting legislation; (9) whether the voting strength of a cohesive minority group has decreased or "retrogressed"; and (10) whether district boundaries have been manipulated to adjust the relative size of minority groups, including instances of "packing."

*Id.*

Here, Plaintiffs have presented no direct evidence of discriminatory purpose attached to the current at-large voting scheme for St. Gabriel's City Council. In addition, Plaintiffs have not provided guidance as to how the Court should infer a discriminatory purpose based on circumstantial evidence in the record.[11] In its assessment of circumstantial evidence based on the facts of this case, the Court finds that Plaintiffs have failed to present any evidence showing that St. Gabriel's current at-large City Council election scheme was enacted with a discriminatory purpose.

Appraising the totality of relevant facts, the Court reiterates many of its findings, *supra*, which it considered in the evaluation of the totality of the

---

[11] Notably, Plaintiffs' pre-trial brief contained no argument regarding the Fourteenth and Fifteenth Amendments, only a cursory recitation of the text of the Amendments. (*See* Doc. 18 at p. 5). Plaintiffs' post-trial brief did not mention their constitutional claims at all. (*See* Doc. 32). Nonetheless, Plaintiffs' counsel confirmed at trial that Plaintiffs have not abandoned their Fourteenth and Fifteenth Amendment claims. (Tr. I at 8:5–8:13).

circumstances under the *Gingles* test for Plaintiffs' VRA Section 2 claim. Plaintiffs have presented no evidence that minority whites are excluded from St. Gabriel's political process, that elected officials are unresponsive to minority white needs, that white minority members possess lower socioeconomic status due to inferior education or housing or housing, or that historical context provides a basis by which to infer discriminatory purpose against whites. Plaintiffs do not identify a specific sequence of events leading up to the original decision to conduct at-large City Council elections, nor is there record evidence that this decision departed from normal procedure in establishing elections for governing boards of Towns or Cities in Louisiana, or that St. Gabriel precinct boundaries were manipulated to adjust for the relative size of minority groups. As discussed *supra*, the Court finds that Plaintiffs have not met their burden to prove that bloc voting exists among the white minority. Accordingly, the Court does not consider the white minority to be a "cohesive minority group" such that an analysis of white minority voting strength would be instructive to prove discriminatory purpose.

However, the Court finds support for one factor in the totality of relevant facts: white minority voter registration in St. Gabriel is low, not having surpassed 28% in elections from 2003 through 2011. (*See* Ex. P-3 at p. 39, tbl.1.3). Yet this factor alone does not compel the Court to infer a discriminatory purpose in the current at-large voting system, as opposed to merely voter apathy among white voters.

Without direct or circumstantial evidence of discriminatory purpose and, indeed, with no argument by Plaintiffs regarding the merits of their constitutional claims, Plaintiffs have failed to prove their vote dilution claims under either the Fourteenth or Fifteenth Amendments.

## VI.  JUDGMENT

**IT IS ORDERED, ADJUDGED,** and **DECREED** that **JUDGMENT** is hereby rendered **IN FAVOR OF** Defendant, City of St. Gabriel, and **AGAINST** Plaintiffs, Milisa C. York and Barry Bernard LeBlanc, as to alleged violations of **Section 2 of the Voting Rights Act** and the **Fourteenth and Fifteenth Amendments to the U.S. Constitution**.

**IT IS FURTHER ORDERED** that Plaintiffs' request for injunctive relief in the form of a court-ordered districting plan is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' request for attorney's fees, expert's fees, and costs is **DENIED**.

Baton Rouge, Louisiana, this 4th day of March, 2015.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**